UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| UTEX COMMUNICATIONS CORP., | § | Case No. 10-10599-CAG |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

**AT&T TEXAS' MOTION (A) FOR ALLOWANCE AND IMMEDIATE PAYMENT OF ADMINISTRATIVE CLAIMS AND (B) FOR ENTRY OF AN ORDER COMPELLING THE DEBTOR TO IMMEDIATELY ASSUME OR REJECT THE INTERCONNECTION AGREEMENT WITH THE DEBTOR AND (C) FOR RELIEF FROM THE AUTOMATIC STAY SO THAT AT&T TEXAS MAY SUSPEND OR TERMINATE THE INTERCONNECTION AGREEMENT**

Southwestern Bell Telephone Company d/b/a AT&T Texas ("AT&T Texas") files this motion (A) for allowance and immediate payment of administrative claims owed by UTEX Communications Corp. d/b/a Featuregroup IP ("UTEX" or the "Debtor") to AT&T Texas under section 503(b) of the Bankruptcy Code, and (B) for Entry of an Order Compelling the Debtor to Immediately Assume or Reject the Interconnection Agreement with AT&T Texas and (C) For Relief from the Automatic Stay So That AT&T Texas May Suspend or Terminate the Interconnection Agreement (the "Motion"), and in support thereof would respectfully show the Court as follows:

## I.    INTRODUCTION

1.    As of the commencement of this chapter 11 case, there were several ongoing disputes between AT&T Texas and the Debtor involving issues arising out an Interconnection Agreement (defined below) mandated under the Federal Telecommunications Act of 1996 and subject to the regulatory supervision of the Public Utility Commission of Texas ("PUC"). In one of these disputes, an administrative proceeding before the PUC (PUC Docket No. 33323), the PUC ruled against UTEX on several key issues and issued a $3.7 million money damages award

in favor of AT&T Texas for services rendered by AT&T Texas to the Debtor through September 2007. As a result of the outstanding balance owed by the Debtor to AT&T Texas, AT&T Texas filed a Proof of Claim in the amount of approximately $9.5 million for charges owed based on the award issued by the PUC.

2.  The Debtor's refusal to pay AT&T Texas continues post-bankruptcy – even in the face of the PUC's ruling and award – which mandates that UTEX must pay AT&T Texas. Since the filing of this bankruptcy case, the Debtor has failed to pay all of the post-petition amounts due under the Interconnection Agreement for post-petition services, raising the same blizzard of "questions" the Public Utility Commission of Texas already rejected.[1] The total amount owed for these post-petition services under the Interconnection Agreement is approximately $102,000.00, and continues to grow each day.

3.  By this Motion, AT&T Texas seeks a court order compelling immediate payment of AT&T's administrative claims under section 503(b) of the Bankruptcy Code and for authority to suspend or terminate the Interconnection Agreement based on the Debtor's non-payment.

## II.  BACKGROUND FACTS

**A.  Contractual Relationship Between the Debtor and AT&T Texas**

4.  The Debtor is a competitive local exchange carrier ("CLEC") and, in addition to several other entities, is a subsidiary of Worldcall, Inc. ("Worldcall"). The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified at 47 U.S.C. § 151 et. seq.) (the "Act"), requires incumbent local exchange carriers ("ILECs"), like AT&T Texas, to enter into interconnection agreements ("ICAs") with CLECs like UTEX. These ICAs establish terms and

---

[1] UTEX sent AT&T's counsel letters on June 1 and June 10, 2010 raising various "questions" regarding AT&T's billing. AT&T is confident that it has properly removed all of the pre-petition balances on the UNE/Resale Billing Account Numbers (BANs) as well as the Interconnection BANs. Furthermore, no adjustments were made based on the "questions" raised in UTEX's June 1 letter because AT&T does not believe any adjustments are merited. AT&T is prepared to meet and discuss any legitimate unanswered "questions" regarding AT&T's post-petition bills, but the questions raised in the June letters are nothing more than spurious delaying tactics.

90126277.6                                    - 2 -

conditions on which ILECs provide their competitors with, among other things, interconnection and other telecommunication services on a wholesale basis.

5. In accordance with this regulatory scheme, AT&T Texas and the Debtor entered into an ICA on or about September 27, 2000 (the "Interconnection Agreement"), which the PUC approved. Pursuant to the Interconnection Agreement, AT&T Texas provides the Debtor with (i) Resale Services, (ii) Unbundled Network Elements, (iii) Ancillary Functions and (iv) Interconnection, as those terms are set forth and further defined in the Interconnection Agreement.

**B.   AT&T Texas' Claims Against UTEX.**

6. On March 23, 2010, April 9, 2010 and April 22, 2010, the Debtor filed various versions of Amended Schedules of Assets and Liabilities ("Schedules"). Each of the Schedules listed AT&T Texas as an unsecured creditor with alleged "disputed" claims aggregating approximately $9.8 million [Dkt. No. 16, 59 and 71].

7. On July 2, 2010, AT&T Texas filed a Proof of Claim in the amount of $9,570,642.76 on account of the pre-petition amounts owed by UTEX under the Interconnection Agreement and based upon the Award by the PUC.

8. Since the filing of the case, the Debtor has refused to pay AT&T Texas amounts due under the Interconnection Agreement for post-petition services, even though the PUC unambiguously decided such amounts should be paid by UTEX. Currently, UTEX owes AT&T Texas approximately $102,000 as an administrative claim under section 503(b) of the Bankruptcy Code. Attached hereto as **Exhibit A** is a chart setting forth the amounts owed by UTEX.

**C.   Relevant Terms of the Interconnection Agreement**

9. Section 8 of the Interconnection Agreement states:

90126277.6                                                       - 3 -

    8.0    **Payment of Rates and Charges**

    8.1    Except as otherwise specifically provided elsewhere in this Agreement, the *Parties will pay all rates and charges due and owing under this Agreement within thirty (30) days from the bill date of an invoice.* Except as otherwise specifically provided in this Agreement interest on overdue invoices will apply at the six (6) month Commercial Paper Rate applicable on the first business day of each calendar year.

Interconnection Agreement pp. 9-10 (emphasis added).

    10.    Section 9.4 of the Interconnection Agreement discusses billing disputes and provides, in relevant part:

    9.4.1    *The Parties agree that all bills, <u>including bills disputed in whole or in part,</u> are to be paid when due consistent with Section 10*, that interest applies to all overdue invoices as set forth in Section 8.1 to this Agreement, and that no other late payment fee or charge applies to overdue invoices. The Parties further agree that if any billing dispute is resolved in favor of the disputing Party the disputing Party will receive, by crediting or otherwise, interest applied to the disputed amount as set forth in Section 8.1.

. . .

    9.4.3    *Each Party agrees to notify the other Party of a billing dispute* and may invoke the informal dispute resolution process described in Section 9.2. The parties will endeavor to resolve the dispute within thirty (30) calendar days of the Bill Date on which such disputed charges appear, or, if the charges have been subject to the bill closure process described in Section 9.4.2, above, within thirty (30) calendar days of the closure of the billing period covered by such bill closure process.

Interconnection Agreement pp. 9-10 (emphasis added).

    11.    Finally, section 10 of the Interconnection Agreement deals with termination of services of AT&T Texas (defined as "SWBT" under the agreement) to UTEX (defined as "CLEC" under the agreement) and states, in relevant part:

    **10.0**    **Termination of Service to CLEC**

    10.1    If CLEC fails to pay when due (within 30 days of the bill date), any and all charges billed to them under this Agreement, including any late payment charges (Unpaid Charges), and any portion of such charges

90126277.6    - 4 -

remain unpaid more than fifteen (15) days after the due date of such Unpaid Charges, SWBT shall notify CLEC in writing that in order to avoid having service disconnected, CLEC must remit all Unpaid Charges to SWBT within fourteen (14) business days.

. . .

10.3  If the billed carrier disputes the billed charges, it shall, within the fourteen (14) day period provided for above, inform the billing carrier in writing which portion of the charges it disputes, including the specific details and reasons for its dispute; immediately pay to the billing carrier all charges, and the billing carrier shall pay all disputed charges into an interest bearing escrow account and provide verification that the account has been established to the billed carrier. Funds may be released and distributed from the escrow account based upon either: (1) a mutual written agreement by the parties; or (2) in accordance with an order or award resulting from a dispute resolution proceeding.

10.5  If any CLEC charges remain unpaid and undisputed twenty-nine (29) days past the due date, SWBT shall notify CLEC, the Commission and the end user's IXC(s) of Record in writing, that unless all charges are paid within sixteen (16) days, CLEC's service shall be disconnected and its end users shall be switched to SWBT local service. SWBT will also suspend order acceptance at this time.

10.6  If any CLEC charges remain unpaid and undisputed forty (40) days past the due date, CLEC shall, at its sole expense, notify its end users, the Commission and the end user's of Record that their service may be disconnected for CLEC's failure to pay Unpaid Charges, and that its end users must select a new local service provider within five (5) days. The notice shall also advise the end user that SWBT will assume the end user's account at the end of the five (5) day period should the end user fail to select a new local service provider.

10.7  If any CLEC charges remain unpaid and undisputed forty-five (45) days past the due date, SWBT shall disconnect CLEC and transfer all CLEC's end users who have not selected another local service provider directly to SWBT's service . . .

10.9  SWBT may discontinue service to CLEC upon failure to pay undisputed charges as provided in this section, and shall have no liability to CLEC or CLEC's end users in the event of such disconnection.

10.12  After disconnect procedures have begun, SWBT shall not accept service orders from CLEC until all unpaid charges are paid. SWBT shall have the right to require a deposit equal to one month's charges (based on the

> highest previous month of service from SWBT) prior to resuming service to CLEC after disconnect for nonpayment.

Interconnection Agreement, pp. 12-13.

12. The Debtor has failed to make all payments due under the Interconnection Agreement despite the fact the Debtor continues to utilize the services provided by AT&T Texas during the approximately four and a half months since the bankruptcy filing. In that connection, the Debtor owes approximately $102,000, which represents the past due payments for post-petition services. In addition, the Debtor presently owes approximately $14,000 for the current billing cycle, which will come due shortly. If the Debtor continues its non-payment with respect to the current billing cycle, the total post-petition amount owed will increase to approximately $116,000 (the "Post-Petition Claim") and will continue to increase each month the Debtor does not make the required payments.

13. In short, the Debtor is continuing to receive services under the Interconnection Agreement, but is failing to make post-petition payments owed to AT&T Texas. The Debtor's post-petition payment obligations to AT&T Texas are accruing monthly and AT&T Texas is being forced to continue performing its obligations under the Interconnection Agreement without receiving payments due from the Debtor.

### III. LAW AND ARGUMENT

14. AT&T Texas has an administrative expense claim for the services provided to the Debtor under the Interconnection Agreement pursuant to section 503(b) of the Bankruptcy Code and, as discussed below, the Court should utilize its discretion to compel the Debtor to make immediate payment of all the post-petition amounts owed and permit AT&T Texas to suspend or terminate the Interconnection Agreement based on non-payment.

A.  **AT&T is Entitled to an Allowed Administrative Expense Claim Pursuant to Section 503(b)(1)(a) of the Bankruptcy Code**

15. Section 503(b)(1)(A) allows for the priority payment for post-petition expenses of the debtor in possession incurred in preserving the estate. The overriding purpose for allowing payment of administrative expenses under 11 U.S.C. § 503(b)(1)(A) is to facilitate the efforts by the debtor in possession to rehabilitate its business for the benefit of all the estate's creditors. *Park National Bank v. University Centre Hotel, Inc.*, 2007 U.S. Dist. LEXIS 12237, *13-14 (N.D. Fla. 2007) ("This encourages parties to conduct business with a post-petition debtor because such administrative claims are accorded the first level of priority and are paid in full before claims in a lower category."). An administrative expense under section 503(b)(1)(A) exists when the claimant shows "that the claim arose from a post-petition transaction and that the transaction actually benefited the estate." *In re Section 20 Land Group, Ltd.*, 261 B.R. 711, 715 (Bankr. M.D. Fla. 2000).

16. Transactions in the ordinary course of business of the debtor in possession generally create expenses of estate administration. *See In re Crystal Apparel, Inc.*, 220 B.R. 816, 830 (Bankr. S.D.N.Y. 1998); *see also In re Cliftondale Oaks, LLC*, 2006 Bankr. LEXIS 2274, *5 (Bankr. N.D. Ga. June 2, 2006) ("A debtor-in-possession may incur unsecured debt in the ordinary course of business. . . . Claims arising from such extensions of credit are automatically entitled to administrative expense priority under section 503(b)(1)."). Furthermore, where a debtor in possession induces the performance of the counterparty to an executory contract and accepts the benefits from such performance, the debtor in possession is estopped from denying the administrative claim status. *In re Section 20 Land Group, Ltd.*, 261 B.R. 711, 717 (Bankr. M.D. Fla. 2000) ("Having induced IMG to perform and willingly accept the benefits thereof, the Debtor is now estopped to deny that administrative claim status to IMG.").

90126277.6 - 7 -

17. Here, AT&T Texas has provided post-petition services to the Debtor in the ordinary course of business under the Interconnection Agreement. Accordingly, the Post-Petition Claim should be allowed as an administrative expense priority claim under section 503(b)(1)(A).

**B.  AT&T is Entitled to the Immediate Payment of its Allowed Administrative Expense Claim.**

18. AT&T Texas respectfully requests the Debtor be directed to pay immediately the Post-Petition Claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code. Courts have discretion to order debtors to pay immediately an allowed administrative expense claim. *In re Colortex Industries, Inc.*, 19 F.3d 1371, 1384 (11th Cir. 1994) ("The determination of the timing of payment of administrative expenses is a matter within the discretion of the bankruptcy court."). There are several factors courts consider in deciding whether to grant such a request, including the prejudice to the debtor, hardship on the creditor and potential determent to other creditors. *In re TI Acquisition, LLC*, 410 B.R. 742, 746 (Bankr. N.D. Ga. 2009) (citing another court that recognized "three factors in determining how to exercise its discretion on the timing of payment of an administrative expense claim: (1) the prejudice to the debtors, (2) hardship to claimant, and (3) potential detriment to other creditors"); *see also In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005).

19. In weighing the factors listed above, courts may compel immediate payment if the estate is able to pay administrative claims in full. *In re King*, 392 B.R. 62, 68 (Bankr. S.D.N.Y. 2008); *In re Standard Furniture Co.*, 3 B.R. 527, 532 (Bankr. S.D. Cal. 1980) (providing for immediate payment of administrative expense claim since all administrative expenses were to be paid in full). However, even if the Debtor is administratively insolvent, the Debtor is still required to pay its ongoing post-petition operating expenses when they become due despite the

fact that other administrative creditors may not receive full payment. As one court stated:

> When there is the possibility that the assets of the estate will not be sufficient to cover all expenses of administration, it is legally improper to pay one expense of the Debtor or Debtor-in-Possession before paying another, except those incurred in the ordinary course of the Debtor-in-Possession's business operation.

*In re Western Farmers Assoc.*, 13 B.R. 132 (Bankr. W.D. Wash. 1981) (emphasis added) (denying interim payment of professionals and rejecting argument that interim payment was warranted because debtor was currently paying other expenses); *see also In re Vernon Sand & Gravel, Inc.*, 109 B.R. 255 (Bankr. N.D. Ohio 1989) ("Practical necessities require that administrative expenses resulting from the ordinary course of business be paid immediately . . . .").

20. According to its Monthly Operating Reports ("MORs"), the Debtor is continuing to operate its business and incur ordinary course expenses, paying other vendors, suppliers, and service providers. Accordingly, the Debtor presumably can meet its ongoing post-petition obligations. In fact, the Debtor is required to meet its ongoing operational expenses. If the Debtor cannot afford to pay AT&T Texas for ongoing service under the Interconnection Agreement, then this case does not belong in chapter 11.

21. The harm to AT&T Texas is clear. AT&T Texas has been forced to provide continued service to the Debtor under the Interconnection Agreement without full payment for those services, resulting in mounting losses.[2] The Debtor should not have it both ways. The Debtor should not be permitted to reap the benefit of the use of the services without fully compensating AT&T Texas for such use. The Debtor should be compelled to make AT&T Texas whole for the post-petition period by paying the requisite amounts owed under the Interconnection Agreement.

---

[2] AT&T Texas has only been paid a total of approximately $13,500 in post-petition amounts due under the Interconnection Agreement.

90126277.6     - 9 -

22. Accordingly, the Post-Petition Claim should be an allowed administrative expense claim and the Debtor should be compelled to immediately pay the Post-Petition Claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

**C. The Court Should Require UTEX To Immediately Assume or Reject, or Authorize AT&T Texas To Terminate The Interconnection Agreement Due to UTEX's Non-Payment for Post-Petition Services.**

23. Under Section 365(a) of the Bankruptcy Code, "subject to the court's approval, [a debtor] may assume or reject any executory contract or unexpired lease." See 11 U.S.C. § 365(a). Courts have traditionally reviewed a debtor's decision to assume or reject an executory contract under the business judgment standard. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee St. Paul & Pacific R.R. Co.*, 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

24. However, a debtor's ability to assume or reject is not unlimited. In *COR Route 5 Co., LLC v. Penn Traffic Co.* (*In re Penn Traffic Co.*), 524 F.3d 373, 383 (2d Cir. 2008), the Second Circuit observed, when referring to contracts that expire postpetition by their own terms or by the debtor's actions: "[a] contract's mere executory nature as of the commencement of the proceeding-without more-will not guarantee the debtor the availability of § 365's assumption and rejection provisions."

25. In this case, AT&T Texas requests the Court require UTEX to immediately assume or reject the Interconnection Agreement pursuant to section 365(d)(2) of the Bankruptcy Code based on the Debtor's non-payment of post-petition amounts. Section 365(d)(2) provides that, "In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to

such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease." 11 U.S.C. § 362(d)(2). Such relief is necessary so that AT&T Texas does not continue to suffer pecuniary losses as each day passes.

26. AT&T Texas also requests the Court grant it relief from the stay in order to suspend and terminate the Interconnection Agreement due to the debtor's post-petition breach thereof. Bankruptcy Courts have held that it is appropriate for a non-debtor party to seek relief from the stay in order to terminate based on non-payment for post-petition services. *See, e.g., In re Payless Cashways, Inc.*, 305 B.R. 303, 308 (Bankr. W.D. Mo. 2004) ("Zurich elected to seek relief from the automatic stay in order to terminate the policies."): *In re Hutchins*, 211 B.R. 325, 327-28 (Bankr. E.D. Ark. 1997) ("Inasmuch as the contracts were property of the estate, the creditor was required to seek relief from stay to terminate the debtor's rights in those contracts").

27. Courts have held that a debtor's failure to make post-petition payments constitute "cause" for relief from stay and have allowed a non-debtor party to terminate contracts where there was no possibility the debtor was able to perform under them. *See, e.g., In re Rocchio*, 125 B.R. 345 (Bankr. R.I. 1991)(finding debtors' failure to pay post-petition rent and an absence of evidence of debtors' attempt to cure the default, provide adequate protection or offer adequate assurance of future performance as "cause" per § 362(d)(1) to lift the automatic stay); *see also In re Deppe*, 110 B.R. 898 (Bankr. D. Minn. 1990) (finding that "the existence of nonremedial grounds for termination, and the estate's reluctant inability to assume the franchise agreements, give it 'cause' for a grant of relief from stay"); *Buffkin v. Goodson* (*In re Goodson*), 12 B.R. 883 (Bankr. S.D. Fla. 1981)(debtor's failure to cure pre-petition default, as well as failure to offer to cure or provide adequate assurance of future performance prevented debtor from assuming lease, and court terminated lease by default).

28. Where, as here, relief from stay is grounded in cause based on a lack of post-petition payments, Courts have explained that the moving creditor must establish a *prima facie* case supporting the cause for relief from the automatic stay, including: (1) a showing of an obligation owing by the debtor to the creditor; (2) a valid security interest as to which relief from stay is sought, and (3) a post-petition default. *See In re Milstein*, 304 B.R. 208, 212 (Bankr. E.D. Pa. 2004) (citing *In re American Sweeteners, Inc.*, 1999 WL 1068446 *2 (Bankr. E.D. Pa.) and *In re Kim*, 71 B.R. 1011, 1016 (Bankr. C.D. Ca. 1987)). *See also In re El Paso Refinery, L.P.*, 220 B.R. 37, 45 (Bankr. W.D. Tex. 1998) ("A post-petition breach. . . might afford sufficient "cause" to warrant the court's intervention."); *In re U.S. Brass Corp.*, 173 B.R. 1000, 1006 (Bankr. E.D. Tex.1994) (relief from stay granted to unsecured creditor when "balance of hardships" tips in creditor's favor).

29. In the case at bar, AT&T Texas meets each of the elements necessary to establish "cause" necessary for relief from the stay. UTEX and AT&T Texas are parties to the Interconnection Agreement under which UTEX has not paid AT&T Texas for post-petition services and under which UTEX owes AT&T Texas approximately $9.5 million relating to the pre-petition period. Furthermore, AT&T Texas believes that UTEX does not have the ability to assume the Interconnection Agreement under section 365(b) of the Bankruptcy Code since UTEX does not have the ability to (a) cure all past due amounts under the Interconnection Agreement, (b) compensate AT&T Texas for its actual pecuniary loss, and (c) provide AT&T with adequate assurance of future performance. Under such circumstances, the Court should permit AT&T Texas to terminate the Interconnection Agreement.

### IV. CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, AT&T Texas respectfully requests that the

Court enter an order (1) allowing and compelling immediate payment of post-petition amounts owing to AT&T Texas as administrative expenses, (2) compelling the Debtor to assume or reject the Interconnection Agreement immediately or, alternatively, lifting the automatic stay so that AT&T may suspend or terminate the Interconnection Agreement and (3) granting AT&T Texas all such other and further relief as is deemed just and proper, either at law or in equity.

Dated: August 20, 2010.

Respectfully submitted,

**FULBRIGHT & JAWORSKI L.L.P.**
David A. Rosenzweig, Esq.
666 Fifth Avenue
New York, New York 10103-3198
Telephone: 212.318.3000
Facsimile: 212.318.3400
drosenzweig@fulbright.com

 /s/ Johnathan C. Bolton
Johnathan C. Bolton, Esq.
State Bar No. 24025260
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: 713.651.5151
Facsimile: 713.651.5246
jbolton@fulbright.com

-and-

**GRAVES, DOUGHERTY, HEARON & MOODY, P.C.**
Frank R. Monroe
401 Congress Avenue, Suite 2200
Austin, Texas 78701
Telephone: 512.480.5707
Facsimile: 512.480.5886
fmonroe@gdhm.com

**ATTORNEYS FOR CREDITOR SOUTHWESTERN BELL TELEPHONE COMPANY D/B/A AT&T TEXAS**